UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**
J.N  JUN 2 9 2006
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MODERATE PARTY, )
BILL SCHEURER, CITIZENS FOR )
BILL SCHEURER, JOHN PAUL A. )
GODINEZ and JEAN PASKALIDES, )
    Plaintiffs, )   Civil Action
 )   No._____
vs. )   Trial by Jury Demanded
)
DEMOCRATIC CONGRESSIONAL )
CAMPAIGN COMMITTEE, RAHM )
EMANUEL, DANIEL LIPINSKI, )
MICHAEL J. MADIGAN, )   06CV3532
ANTHONY R. CONSTANTINE ind., )   JUDGE MORAN
and d/b/a A.R. CONSULTING )   MAG. KEYS
GROUP, and unknown co-conspirators,)
and for injunctive relief only the )
following additional defendants: )
JESSE SMART, Chairman, WANDA )
REDNOUR, Vice Chairman, )
JOHN R. KEITH, WILLIAM M. )
McGUFFAGE, DAVID E. MURRAY, )
ALBERT S. PORTER, ELAINE )
ROUPAS and BRIAN SCHNEIDER, )
The ILLINOIS STATE BOARD OF )
ELECTIONS, the STATE OFFICERS )
ELECTORAL BOARD, and each of )
its members, )
    Defendants. )

## COMPLAINT

### I. Preliminary Statement

1. The Plaintiffs, by and through their attorney Andrew B. Spiegel, sue the

defendants DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE,

RAHM EMANUEL, DANIEL LIPINSKI, MICHAEL J. MADIGAN, ANTHONY

R. CONSTANTINE ind., and d/b/a A.R. CONSULTING GROUP, and unknown co-conspirators for subverting the democratic process in the nomination of candidates to run in the 8th Congressional District of Illinois, thereby violating the U.S. and State Constitutions and numerous federal and state laws – both civil and criminal in nature.

2. As the direct result of the conspiracy hatched by this first group of defendants, the MODERATE PARTY, BILL SCHEURER and CITIZENS FOR BILL SCHEURER were prevented from obtaining sufficient signatures in time to meet the June 26, 2006 filing deadline for new parties and to withstand the Objector's Petition that minions of these DCCC defendants are expected to file by the July 3rd 2006 deadline.

3. Injunctive relief is sought against the second group of defendants – the ILLINOIS STATE BOARD OF ELECTIONS and its members both in its capacity as the election authority in Illinois and in its capacity as the STATE OFFICERS ELECTORAL BOARD, which will sit in judgment of the candidate's nominating petitions if the injunctive relief sought herein is not allowed.

4. If BILL SCHEURER is stricken from the ballot, both the candidate and all his prospective supporters in the district, such as JOHN PAUL A. GODINEZ and JEAN PASKALIDES, will be deprived of their right to vote for the candidate of their choice in any meaningful manner in the November 7, 2006 General Election in the 8th Congressional District.

## II. Jurisdiction

5. Jurisdiction is conferred on this court in accordance with 28 U.S.C. §1331 for the federal claims brought pursuant to the U.S. Constitution, Amendments 1 and 14 and *inter alia*, 42 U.S.C. §1983, et. seq... The pendent jurisdiction of the court is invoked for the state claims.

## III. Venue

6. This action properly lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §1391(b), because the defendants reside or do business in this judicial district and because the actions complained of occurred in this district.

## IV. Parties

7. The MODERATE PARTY, is a new party in the 8th Congressional District and is seeking to nominate BILL SCHEURER as its candidate for that office.

8. BILL SCHEURER (hereinafter "Scheurer") is a registered voter and is the nominee of the MODERATE PARTY for the House seat in the 8th Congressional District.

9. CITIZENS FOR BILL SCHEURER (hereinafter "CBS") is the campaign committee established by the supporters of BILL SCHEURER and the MODERATE PARTY for the purpose of nominating him as the MODERATE PARTY candidate and electing him to the House of Representatives from the 8th Congressional District.

3

10. JOHN PAUL A. GODINEZ and JEAN PASKALIDES are two additional voters representing the supporters of BILL SCHEURER and the MODERATE PARTY in the 8th Congressional District all of whom who will be deprived from voting for the candidate of their choice if Scheurer is not on the ballot this November.

*The DCCC Defendants*

11. Defendant DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE (hereinafter DCCC"), is the official national Democratic campaign committee charged with recruiting, assisting, funding and electing Democrats to the U.S. House of Representatives. Among the services the DCCC provides is management consulting and, on information and belief, the dirty tricks and subversion of the democratic process as alleged in this complaint.

12. RAHM EMANUEL, (hereinafter "Emanuel") is the Chairman of the DCCC, and is a Democratic Congressman from the 5th Congressional District. On information and belief, he was one of the conspirators in the attempt to sabotage the campaign of Bill Scheurer as alleged in this complaint.

13. DANIEL LIPINSKI, (hereinafter Lipinski") is a Democratic Congressman from the 3rd Congressional District. On information and belief, he was one of the conspirators in the attempt to sabotage the campaign of Bill Scheurer as alleged in this Complaint. Lipinski has, on information and belief, an interest in the Defendant A.R. Consulting Group and employs defendant Anthony R. Constantine in his Congressional Office.

4

14. MICHAEL J. MADIGAN, (hereinafter "Madigan") is Chairman of the Democratic Party of Illinois, Chairman of its State Central Committee, Speaker of the Illinois House of Representatives and Representative of the 22nd District. Of all the defendants, Madigan has the most expertise in keeping independent and third party candidates off the ballot in Illinois. His agents obtained copies of and are currently (as of June 26, 2006) preparing to file an Objector's Petition as the next step in attempting to end the candidacy of Bill Scheurer. On information and belief, Madigan was the architect of the conspiracy to deny as many as 10,000 signatures to the nomination of Bill Scheurer as alleged in this Complaint.

15. ANTHONY R. CONSTANTINE individually and doing business as A.R. CONSULTING GROUP, (hereinafter "Constantine" and "ARC") is, on information and belief, an employee of Lipinski and was a part of the conspiracy as alleged in this Complaint.

16. "Unknown co-conspirators" refers to those additional individuals and entities which participated in the conspiracy alleged herein and who will be named as their identities become known in this litigation.

*The State Board Defendants*

17. The ILLINOIS STATE BOARD OF ELECTIONS (hereinafter "SBE") was established by the Illinois Constitution of 1970, Article 1A, 10 ILCS 5/1A-1 and has the general supervision over the administration of the registration and election laws throughout Illinois.

5

18.  The current individual members of the SBE are JESSE SMART, Chairman, WANDA REDNOUR, Vice Chairman, JOHN R. KEITH, WILLIAM M. McGUFFAGE, DAVID E. MURRAY, ALBERT S. PORTER, ELAINE ROUPAS and BRIAN SCHNEIDER.

19.  Once the Objector's Petition is filed, the SBE and its officers will sit as the STATE OFFCIERS ELECTORAL BOARD (hereinafter "SOEB") for the purpose of determining the validity of both objections and those nominating petitions which are the subject of such petitions. The same individual members of the SBE will sit as the members of the SOEB.

### Facts Common to All Counts

20.  Under the Illinois Election Code, (the "Code") 10 ILCS 5/1-1-1 et seq. a new party candidate for the U.S. House of Representatives has 90 days within which to collect the required number of signatures of registered voters in the district. The 90 day period for the 2006 election cycle ran from March 28, 2006 to June 26, 2006.

21.  Bill Scheurer, as a new party candidate in the 8th Congressional District was required under the Code to obtain a minimum of 13,950 signatures, as compared to a Democrat or Republican candidate who needed 766 signatures and 868 signatures respectively (0.5% of the vote for that office in the last Primary Election compared to 5% of the total vote for that office in the General Election for new parties and independents).

6

22. Scheurer, CBS and volunteers began collecting signatures on nominating petitions at the beginning of the 90 day period. Scheurer was not unknown to the voters in the district. He had been a candidate in the Democratic Party Primary Election on March 16, 2004 and had received 7,518 votes: 21.95% of the votes cast by Democrats in that election.

23. In mid-May, 2006, Constantine contacted CBS and offered his services and those of ARC to help CBS collect signatures. Scheurer and his wife Randi met with Constantine. They discussed and agreed upon terms of an oral contract for ARC to collect 10,000 additional signatures for CBS. These terms included staffing, locations and methods, price per signature, reporting and payment procedures, total number of signatures to be gathered by ARC and other details.

24. Constantine also asked about how many signatures CBS already had and would continue to gather through its volunteers. He continued to ask for this information throughout the remaining 90 day collection period, but Scheurer thought nothing of the request at the time. As part of the contract, Constantine and ARC agreed to collect 10,000 signatures by the end of the petition drive and to turn them in on Sunday, June 25th. The filing deadline was the next day, Monday, June 26th.

25. On information and belief, some time prior to Constantine's first contact with CBS, the DCCC Defendants and Unknown additional defendants had a number of meetings and a number of discussions during which they agreed to sabotage the Scheurer campaign and insure he would not be on the November

7

ballot. The DCCC Defendants and the Unknown additional defendants concluded that the best way to do so was by making sure Scheurer did not have enough signatures to stay on the ballot if an objection was filed to his nominating petitions.

26. Ironically, under the Illinois Election Code, if there is no objection made, a candidate can achieve ballot access with as few as ONE signature despite any minimum requirement. See 10 ILCS 5/10-8. However, if an objection is made, the process is to try and knock enough names off the nominating petitions so as to leave the candidate with at least ONE less signature than the minimum requirement. That finding would result in an electoral board removing the candidate's name from the ballot.

27. CBS campaign volunteers continued their efforts, collecting a total of approximately 8,000 signatures by June 18, most of them by going door to door. The Plaintiffs relied on and were confident that with ARC's additional 10,000 signatures and a final volunteer push on the weekend of June 24-25, CBS would succeed in getting on the 2006 ballot with a wide margin over the statutory 13,950 signatures, and in a solid position to overcome any potential objections against specific signatures due to wrong addresses, illegible names, or other such objections.

28. CBS, through Scheurer, continued to communicate with Constantine for the next several weeks both through the telephone and through email, using the contact information provided by Constantine at their first meeting. Pursuant to

8

the contract, ARC gave Scheurer weekly updates on details of its collection process, such as where ARC's signature gatherers were working (to ensure they did not overlap with volunteer teams), how many names his paid signature gathering staff were getting, and other details. Constantine reported he was getting over 2,000 signatures a week -- on track to deliver the agreed 10,000 names.

29. As the 3rd week of the contract began, Scheurer began asking Constantine to meet so he could deliver the first 5,000 signatures Constantine claimed he already had and so CBS could pay him for those services. Constantine told Scheurer he had been called back to Washington, DC for the week and would have to do this the following week.

30. Thereafter, Constantine started failing to promptly return telephone calls placed to his business and cell phone numbers, instead communicating with Scheurer primarily by email. After several email exchanges, Constantine agreed to meet on the evening of Monday, June 19th; at that time the initial batch of signatures would be exchanged for the first payment.

31. Constantine failed to call that Monday to confirm the specific time and place for their meeting. Instead, he emailed Scheurer after midnight, apologizing and saying he was detained by a family medical emergency. Scheurer left additional messages on Constantine's voicemail. No call was returned, but he sent a final email on Tuesday night, in which Constantine claimed he was in a Milwaukee hospital on a "matter of life and death." That night, CBS called every

hospital in the Milwaukee area and discovered that no hospital had any patient with the last name of Constantine.

32. When Scheurer called the A.R. Consulting Group's phone number the next morning, Wednesday June 21st, a man named "Jimmy," who identified himself as (Constantine's brother, answered the phone and stated that Anthony Constantine was at work; he then provided Constantine's telephone number at work. Scheurer called that number and was connected to the Chicago office of Democratic Congressman Lipinski.

33. Scheurer asked for Anthony Constantine. He was informed that Constantine had "just stepped out of the office for a moment." A second call to that number an hour later resulted in a Lipinski staffer informing the caller that Anthony Constantine was in the Congressman's LaGrange office. A caller to that office was informed that Constantine had "stepped out for a moment."

34. As all signs began to point to the fact that the signature-collecting contract agreed by Constantine and ARC was in fact a blatant attempt by the DCCC Defendants and Unknown additional Defendants to sabotage the Scheurer campaign; that the purported signatures gathered would not be forthcoming, and that the purpose of this fraud was to prevent Scheurer from qualifying for the ballot with a sufficient number of signatures.

35. The CBS campaign made a final effort to speak with Constantine, offering him a chance to clear his name before any further action was taken to rectify this pollution of the electoral process.

36. Late in the day on Thursday June 22, Constantine finally picked up one of many repeated calls Scheurer had made to his cell phone number. When confronted with these facts, Constantine claimed he had never met anyone named Bill Scheurer, and had never made any agreement to collect signatures. Constantine confirmed that the phone numbers on the A.R. Consulting Group business card given to Scheurer were his, and that he was the principal in that firm.

37. Constantine became belligerent when the issue was raised that emails sent on election business during work hours by someone employed by the federal government could be a violation of the Hatch Act, in addition to the issues of fraud related to the contract itself. He repeatedly insisted that he could not be guilty of any fraud because he had not signed any written contract with Scheurer nor received any money from him -- two points that Constantine brought up on his own, revealing a personal knowledge of the details of the scam without being told of them.

38. Scheurer suggested that Constantine stop by the campaign office to "show his face" to establish that he was not the same person Scheurer had met back in May. Scheurer also asked Constantine to bring his brother Jimmy to this meeting, noting that if Constantine himself had also been a victim of this scam i.e., the theft of his identity by someone falsely representing himself to be him, in the course of the commitment of wire fraud, election fraud, and contract fraud --

11

a quick visit could clear up this aspect of the matter. Constantine declined the offer.

39. During the weekend of June 24-25, dozens of CBS campaign volunteers went out into the district and gathered approximately 5,000 more voter signatures for Scheurer's candidacy to appear on the ballot.

40. CBS filed its nominating petition at the State Board of Elections in Springfield, Illinois at 1:20 p.m. on Monday June 26th, the deadline for filing. At 2:32 p.m., Madigan's attorney requested copies of the Scheurer petition and has indicated he will be filing an objector's petition because Scheurer did not file the minimum number of signatures required for a new party candidate filing in the 8th Congressional District.

## Count I
### All Defendants – Injunctive Relief

41. Plaintiffs re-allege and incorporate herein by reference paragraphs 1-40 above as paragraph 41 of this Count I.

42. Plaintiffs will suffer irreparable harm unless this court grants equitable relief from their current situation. A place on the ballot as the Moderate Party candidate for the 8th Congressional District in the November 7, 2006 General Election cannot be replaced with any amount of money damages.

43. Unless the SBE and SOEB defendants are enjoined from proceeding to adjudicate the pending objection to the Scheurer nominating petition, they will

find that an insufficient of signatures have been filed and will order his name stricken from the ballot.

44. Plaintiffs are likely to succeed in proving the fraud and conspiracy perpetrated upon them, but that will take some time any may not be in time to secure Scheurer's position on the November ballot.

45. This court in the past has extended the time for candidates to submit signatures and Plaintiffs request that relief in this case, allowing them the time they lost as a result of the DCCC defendants' fraud to collect additional signatures.

WHEREFORE the Plaintiffs herein request the court grant them equitable relief as follows:

    a. enjoining the SBE and SOEB defendants from ruling and passing upon any objections filed to the Bill Scheurer nominating petitions;

    b. granting the Bill Scheurer campaign at least sixty additional days to collect and submit additional signatures;

    c. ordering the SBE and its individual defendants to accept those additional signatures as part of his nomination process;

    d. granting Plaintiffs such other and further relief as the court deems just and equitable in the circumstances.

## Count II
### DCCC and Unknown Additional Defendants
### 42 U.S.C. 1983

46. Plaintiffs re-allege and incorporate herein by reference paragraphs 1-40 above as paragraph 46 of this Count II.

47. The object of the DCCC defendant's and unknown other's conspiracy – to deprive Scheurer a place on the Ballot in the November election, will be realized unless this court acts to restore a free and fair election in the 8th Congressional District.

48. The deliberate sabotaging of the campaign of Scheurer by the DCCC Defendants, each of whom conspired with each other to realize the goal of this conspiracy, was in direct violation of the First Amendment rights of the Plaintiffs to peacefully assemble and to participate in a free and fair election in the 8th Congressional District without interference from opposing parties.

49. These actions are being taken, and will continue to be taken under color of state law and have deprived and will continue to deprive these Plaintiffs and the voters in the 8th District of the rights and privileges they should enjoy under the First and Fourteenth Amendments to the Constitution of the United States.

50. The Plaintiffs have suffered injury and damages as a result of the DCCC defendants' actions.

Wherefore, Plaintiffs request an award of compensatory damages against the DCCC Defendants jointly and severally in their favor in an amount that will make them whole, punitive damages in an amount to deter these Defendants

from engaging in or condoning such behavior in the future, for the costs of this action and for reasonable attorneys' fees pursuant to 42 U.S.C.§1988.

## Count III
### All DCCC Defendants
### and Unknown Defendants
### Fraud

51. Plaintiffs re-allege and incorporate herein by reference paragraphs 1-40 above as paragraph 51 of this Count III.

52. Scheurer and the CBS relied on the representations of Constantine and ARC to obtain 10,000 signatures and as a result of their reliance, refrained from securing signatures from other sources.

53. As the result of Plaintiff's reliance and the failure of Constantine and ARC to obtain 10,000 signatures, Scheurer and CBS lost at least Sixty days they could have used to obtain signatures from other petitioners.

54. They also were placed in a position of having to submit the signatures they already had in time for the current deadline of June 26th.

55. Constantine and ARC and unknown defendants knew at the time they made their representations to Scheurer and the CBS that those representations were false and that they never intended to obtain any signatures for Scheurer.

56. The actions of Constantine and ARC were part of the conspiracy of the DCCC defendants to deny the Plaintiffs and their supporters their right to nominate the candidate of their choice.

15

Wherefore, Plaintiffs request an award of compensatory damages against the DCCC Defendants jointly and severally in their favor in an amount that will make them whole, punitive damages in an amount to deter these Defendants from engaging in or condoning such behavior in the future, for the costs of this action and for reasonable attorneys' fees.

Respectfully submitted,

Andrew B. Spiegel

Andrew B. Spiegel
15 Spinning Wheel Road
Suite 126
Hinsdale, Illinois 60521
630 325-5557